**Jill M. GAUTNEY, Plaintiff,**

v.

**AMERIGAS PROPANE, INC., Defendant.**

**No. CIV. A. 99–197.**

United States District Court, E.D. Pennsylvania.

July 28, 2000.

---

William T. Wilson, West Chester, PA, for Plaintiff.

Brendan Sweeney, Philadelphia, PA, for Defendant.

### MEMORANDUM

LOWELL A. REED, Jr., Senior District Judge.

Plaintiff Jill M. Gautney ("Gautney") claims that defendant AmeriGas Propane, Incorporated ("AmeriGas") discriminated against her in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2. ("Title VII") and the Pennsylvania Human Relations Act 43 P.S. § 951 ("PHRA"). Gautney also claims that AmeriGas breached her employment contract and violated the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 et seq. ("WPCL").

Currently before the court is the motion of AmeriGas for summary judgement (Document No. 11). This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Based upon the following analysis, the motion will be granted in part and denied in part.

## I. BACKGROUND[1]

AmeriGas hired Gautney as a District Manager in October 1994. In November 1995, AmeriGas promoted Gautney to the position of Market Development Manager ("MDM") in the Corporate Development Department. She was one of seven MDM's and the only female MDM.

In October 1996, AmeriGas reorganized the Corporate Development Department, appointing Willaim Katz as Vice President of Corporate Development and reducing the number of MDM's from seven to four. With that reorganization, Gautney lost her MDM position, but remained employed by AmeriGas. Within two weeks, however, an MDM position became available and Gauntey was rehired as an MDM. (Gautney Dep. at 22–25; Katz Dep. at 9–10). Again, she was the only female MDM.

Gautney's primary responsibility as an MDM was to identify and open new business locations for AmeriGas. According to statistics gathered about the MDMs, Gautney had the highest cumulative ranking. (Castor Dep. at 142–43, 163). These ranking took into account all budget factors. (*Id.* 164–65).

Gautney's territory encompassed the area from Maine to North Carolina and west to Illinois. Her position thus required her to travel extensively. (Gautney Dep. at 35). In general, MDM's were required to travel sixty to seventy percent of their time. (Castor Dep. at 141). Gautney had added travel responsibilities because she was involved in a project for AmeriGas' holding company involving market development in China. (*Id.* at 141–42). She testified that she was in the field ninety percent of the time. (Gautney Dep. at 59).

The three other MDMs (after the 1996 reorganization) were Bob Jones, Dave Fuson and Dave Becker. Jones lived in Florida and rented office space, paid for by AmeriGas, close to his home. Similar arrangements were made for Fuson who lived in Idaho and for Becker who lived in Nevada. Gautney, who lived in Malvern, Pennsylvania, was required to maintain an office at the AmeriGas Corporate headquarters in Valley Forge, Pennsylvania, which was approximately an hour commute

---

**1.** The following facts are based on the evidence of record viewed in the light most favorable to plaintiff Jill Gautney, the nonmoving party, as required when considering a motion for summary judgment. *See Carnegie Mellon Univ. v. Schwartz,* 105 F.3d 863, 865 (3d Cir.1997).

from her home. Norm Castor, an analyst who assisted the MDM's, also maintained an office at the Valley Forge facility. (Gautney Dep. at 27–30; Castor Dep. at 140).

Prior to the reorganization in 1996, Gautney was able to maintain a home office. In her deposition testimony, Gautney equivocated as to whether she thought that Katz was discriminating against her on account of her gender by requiring her to maintain an office at the Valley Forge headquarters. (Gautney Dep. at 28–29) ("If I look at it as a separate event, the answer is no. If I look at it in conjunction with many events, the answer is maybe.").

As part of the 1996 restructuring, Jones was made Director of New Business Development. (Katz Dep. at 8). Jones retained his MDM responsibilities but also became responsible for the supervision of the other MDM's. (Jones Dep. at 13–14). Because the MDM's usually lived and worked in their respective geographic areas, they did not see each other on a day-to-day basis. There were, however, occasions when the MDM's convened for business meetings.

Gautney testified that during the course of one such meeting, a two-day affair in Baltimore in April 1997, Dave Fuson and another employee from North Carolina went to a strip club in the evening. (Gautney Dep. at 85–87). Although she did not see them go, she testified that she heard them talking about it the next morning. (*Id.*). Gautney did not think that Katz went to the strip club and did not know if Jones went. (*Id.*).

In October 1997, when the group met again in New Orleans, Gautney was with the other MDMs as they explored New Orleans and when they decided to enter a strip club. In the strip club, Gautney had two drinks and, according to Castor, appeared to be having fun, saying she might learn something about how to excite her boyfriend. (Castor Dep. at 71–77). At one point, Gautney was invited to contribute to a collection of funds to pay for a "lap dance" for Jones. (Gautney Dep. at 92). Gautney left shortly thereafter, but not before inviting the group across the street to another establishment where the exotic dancers were transvestites. (Gautney Dep. at 90–92). Only Castor took her up on the offer. At the transvestite strip bar, Gautney and Castor talked about the performers, trying to guess whether they were male or female. (Castor Dep. at 78–81). At one point, Gautney slipped a dollar bill into the G-string of a performer. (*Id.* at 78).

Gautney further testified that during the course of the evening Fuson lowered his pants slightly (without exposing his genitalia) to display a tattoo on his pelvic bone. Apparently, Fuson and Gautney also went into a sex shop together while the other members of their group waited for them outside. (Fuson Dep. at 49).

In addition, according to Gautney, while on a business trip to northern New Jersey with Jones, he told her that she was only using one-third of her assets, that strong women can be intimidating to men, that she should wear skirts and heels to work, and that she should use her "womanly wiles" to influence the men around her. (Gautney Dep. at 42, 118–120). When she told Jones that he could get in trouble for such statements, Jones warned that he would deny ever having made such a comment. (Gautney Dep. at 120). Jones denies having made any such comment. (Jones Dep. at 42–44).

According to Gautney, Castor, the only member of the group whose office was also at Valley Forge, talked to her "all the time about women, and his adventures, and the size of his sex organs and, you know, his escapades with other women...." (Gautney Dep. at 54). Castor also left a story he wrote on Gautney's desk for her to read. (Gautney Dep. at 51). He apparently forewarned Gautney that it contained sexually explicit material. Gautney insisted that she wanted to read it. After reading it, she told Castor that it was well

written and that he seemed to know a woman's body, or a woman, because much of it was written from a woman's perspective. (Castor Dep. at 98). Apparently, Castor also jokingly propositioned Gautney by "volunteering in a joking way to participate in my love life." (Gautney Dep. at 42). Gautney cannot, however, recall any specific comment which she viewed as sexually offensive. (Gautney Dep. at 42, 54).

In early May 1997, Gautney had lunch with Jocelyn Keleman, manager of Communications in the Human Resources Department, and Carol Guinan, who was then employed as the Manager of Employee Benefits. At the luncheon, Gautney stated that she was being treated differently than other employees in her department and that the "guys would submit their wining and dining of women on their expense reports." (Plt Mem., Exh. 6 ("Guinan Affidavit") at ¶ 3). Gautney concluded the conversation by stating that she needed to "vent" and to ignore what she had said.

Nevertheless, Keleman and Guinan reported the conversation to Toni Pollick, Director of Human Resources Programs and Services, and Diane Carter, Vice President of Human Resources. Keleman and Guinan were told to find out if Gautney wanted to make a complaint. Gautney told Guinan not to discuss the matter with anyone else in Human Resources, saying that she had overreacted and that she would prefer to handle her concerns by talking directly with Katz. (*Id.*).

Gautney testified that after her discussion with Guinan and Keleman, she noticed that the men in her department made it clear that they were not charging inappropriate expenses to AmeriGas. (Gautney Dep. at 117–18). Several weeks later when Guinan asked Gautney how she was doing, Gautney said things had been "overblown" during their lunch and that things were going much better. In sum, Gautney had one informal conversation at a luncheon with two women from the Human Resources Department during which she "vented." It is undisputed, however, that Gautney never filed any type of complaint with the Human Resources Department.

In September 1997, Gautney worked from home on a Friday—the day after a business meeting in Bryn Mawr, Pennsylvania. Other attendees were using that day as a travel day. Jones asked her about the day and Gautney explained that she had gone to the meeting directly from out-of-town travel, had a mandatory training program on Saturday and Sunday, and was scheduled to travel again the following Monday. According to Gautney, Jones expressed his understanding, commenting to her, however, that he would act as an intermediary between Gautney and Katz because Katz "doesn't like you." (Gautney Dep. at 61–62).

Katz also talked to Gautney about the Friday she was not in the office. The issue arose during a conversation between Gautney and Katz during which they discussed an number of issues, including Gautney's work in China. According to Gautney, Katz told her that during the work week, if she was not traveling, he wanted her in the office, regardless of whether she worked the prior weekend. (Gautney Dep. at 64). During the course of the conversation, Gautney testified that she asked Katz why he always assumed the worst about her, as opposed to "the guys." According to Gautney, she emphasized the word "guys" to point out that she thought it was a gender-related issue. (Gautney Aff. at ¶ 9).

Gautney also testified that during her discussion with Katz she mentioned a ski trip taken by her "counterparts" during a work day and that their whereabouts were not being similarly scrutinized. (Gautney Dep. at 64, 70). Indeed, in conversation with Fuson and Becker, they told Gautney that Katz did not scrutinize their time and that they were able to take days whenever they needed them, provided that got the job done. (Gautney Dep. at 58).

Katz, however, testified at his deposition that he first learned of the ski trip from "one of the HR people" on the day Gautney was terminated. (Katz Dep. at 66). Katz further testified that he promptly investigated whether Fuson and Becker had taken time off to go skiing on company time. (*Id.* at 67–68). He testified that he learned that Fuson and Becker had gone skiing on two occasions: the first was on a Saturday on their own time and the second was on a workday in the middle of the day. (*Id.*). He further testified, however, that Jones had authorized them to take time off in the middle of the day if they got an early start and worked late that day. (*Id.*; Jones Dep. at 38–40). Jones in turn testified that Fuson and Becker contacted him and asked whether they could take time out of the day to ski. (Jones Dep. at 39). Jones replied that he did not have a problem with their taking time off "as long as you have completed what we sent you there to look for." (Jones Dep. at 39).[2] Gautney has stated under oath, however, that when she told Jones about the ski trip, Jones told her it was the first he had heard about the trip. (Gautney Aff at ¶ 8).

Gautney was terminated for taking off from work on October 17, 1997, without prior authorization and for her lack of candor when confronted by Katz. On Friday, October 17, 1997, Gautney was supposed to be working in northern Virginia analyzing potential new business opportunities for AmeriGas. (Gautney Dep. at 141). Previously she had submitted a travel plan that stated she would be in northern Virginia on the 17th. (Gautney Dep. at 141, 152; Katz Dep. at 44). She also participated in a conference call with Katz and Jones on the 16th during which she stated that she would be scouting locations in Virginia the next day. (*Id.*).

On October 17, 1997, sometime before 11:00 AM, Katz received a facsimile from Gautney that was addressed to "Steve" at "Engineering Design Consultants," but was transmitted to the fax machine in the AmeriGas New Business Development Department. (Katz Dep. at 21–24). In a note at the bottom of the facsimile, it stated in part: "Please call me, I am off work today." (Gautney Dep. at Exh. 3). Gautney's name and home telephone number are on the bottom of the facsimile. (*Id.*).

The facsimile was brought to Katz's attention by his secretary. To confirm the number from which the facsimile was transmitted and the time it was received, Katz printed a journal from the AmeriGas fax machine (Katz Dep. at 24; Katz Dep. Exh. 3). Katz then called Jones to determine if he was aware of any change in Gautney's schedule. (Katz Dep. at 18–19; Jones Dep. at 56).

On Monday, October 20, Katz and Human Resources Director Toni Pollick met with Gautney. (Gautney Dep. at 155; Katz Dep. at 81–82). When Katz asked Gautney where she was on October 17th, she told him that she was working in Virginia. (Gautney Dep. at 156; Katz Dep. at 82). When Katz showed her the facsimile, Gautney did not have an explanation. (Gautney Dep at 158). Katz requested that Gautney provide receipts or other documents that would verify that she was working on October 17th. (Gautney Dep. at 158).

On October 21, 1997, Gautney met with Pollick and admitted that she was not working in Virginia on October 17th. (Gautney Dep. at 168; Katz Dep. at 88–89).[3] Gautney was terminated that same

---

**2.** Jones also testified that Fuson and Becker had worked through the weekend, implying that they earned some time off during the week. (Jones Dep. at 38–39).

**3.** Gautney told Pollick that she did not work on October 17th because she had to assist her father with a medical emergency. Gautney

further testified that she did not send the facsimile and that her mother must have sent it because she was busy taking care of her father. (Gautney Dep at 141). Diane Gautney, her mother, however, testified that she is not proficient at sending facsimiles and that she has no recollection of ever sending a facsimile for her daughter. (D. Gautney Dep.

day from her employment with AmeriGas. Katz testified that the reason he fired Gautney was because she took an unauthorized day off work after a previous warning related to unauthorized absences and because she deliberately attempted to mislead her supervisors as to her whereabouts. (Katz Dep. at 18–19; Katz Exh. 1). Gautney's subsequent claim for unemployment compensation was denied, after a hearing, because the referee found that AmeriGas discharged her "for dishonesty." (Gautney Dep. at 171; Gautney Dep. Exh. 7). AmeriGas hired Ana Rodriguez, a woman, to replaced Gautney. (Jones Dep. at 62).

According to AmeriGas, as a result of her discharge, Gautney did not receive a bonus. Bonuses are governed by the terms of the AmeriGas "Management Incentive Plan." (Gautney Dep. Exh. 15). The Plan states: "Any participant who is disciplined or discharged by the Company for misconduct relating in any way to the performance of his or her duties will not be eligible to receive a bonus. Final discretion for determining participant eligibility ... rests with the Vice President, Corporate Development." (Gautney Dep. Exh. 15 at 56). Katz, the Vice President, Corporate Development, testified that he determined that Gautney was not entitled to a bonus because she was discharged for work-related dishonesty. (Katz Dep. at 19).

## II. LEGAL STANDARD

Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255,

106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A disputed factual matter is a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. The court must make its determination after considering the facts and all reasonable inferences drawn from them in the light most favorable to the nonmoving party. *Id.* at 255–56, 106 S.Ct. 2505. The nonmoving party must produce evidence to support its position, and may not rest upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. v. Du Fresne*, 676 F.2d 965, 969 (3d Cir.1982).

## III. ANALYSIS

In addition to her state law claims, Gautney asserts that she was terminated from her employment with AmeriGas because of her gender in violation of Title VII. She also asserts that she was subjected to sexual harassment and a hostile work environment. Finally, she asserts that she was terminated in retaliation for complaining about being treated differently because of her gender.

■ Gautney asserts similar claims under the PHRA. Courts have uniformly interpreted the PHRA consistent with Title VII. *See Padgett v. YMCA*, 1998 WL 826985, 1998 U.S. Dist. LEXIS 18693, at *10 (E.D.Pa. Nov. 25, 1998); *Clark v. Commonwealth of Pennsylvania*, 885 F.Supp. 694, 714 (E.D.Pa.1995); *Violanti v. Emery Worldwide*, 847 F.Supp. 1251, 1257 (M.D.Pa.1994). Thus, I will analyze Gautney's claims of discrimination only under Title VII; however, my analysis and conclusions are equally applicable to her claims of discrimination in violation of the PHRA. *Harris v. SmithKline Beecham*, 27 F.Supp.2d 569, 576 (E.D.Pa.1998).

### A. *Gender Discrimination*

■ Generally, to state a disparate treatment in employment claim under Title

---

at 31, 36–37, 40, 43). Moreover, documents produced by Diane Gautney's employer show

that she was at work on October 17th. (Included in Defendant's Appendix).

VII, a plaintiff must demonstrate that she was "singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion." *Equal Employment Opportunity Comm'n v. Metal Serv. Co.*, 892 F.2d 341, 347 (3d Cir. 1990). The plaintiff may present either direct evidence of discriminatory intent or indirect evidence of discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ("mixed motives" cases); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (pretext cases). Here, plaintiff has only presented indirect evidence of sex discrimination. None of the plaintiff's evidence " 'proves [gender] discrimination without inference or presumption.' " *Nixon v. Runyon*, 856 F.Supp. 977, 983 (E.D.Pa.1994) (quoting *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993)). In the absence of a proffer of direct evidence of discrimination, the analysis of Gautney's claim is governed by the burden shifting paradigm of *McDonnell Douglas* and its progeny. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Simpson v. Kay Jewelers*, 142 F.3d 639, 643–44 (3d Cir.1998).

To establish a prima facie case of discriminatory discharge, a plaintiff must show that he or she: (1) is a member of a protected class; (2) was qualified for the position; and (3) was discharged under circumstances that give rise to an inference of unlawful discrimination. *Pivirotto v. Innovative Sys.*, 191 F.3d 344, 356–57 (3d Cir.1999); *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir.1995); *Bullock v. Children's Hosp.*, 71 F.Supp.2d 482, 487 (E.D.Pa.1999). Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside of the relevant class. *Bullock*, 71 F.Supp.2d at

487. The plaintiff need not demonstrate, however, that her position was filled by someone outside of her class. *Pivirotto*, 191 F.3d at 357 (3d Cir.1999).

AmeriGas argues that Gautney cannot establish a prima facie case because she cannot show that she was fired under circumstances that give rise to an inference of unlawful discrimination. Specifically, AmeriGas argues that a woman was hired to replace Gautney and Gautney has not shown that similarly situated male employees were treated more favorably.

Gauntey argues that similarly situated males were treated more favorably; namely that her male colleagues were not held similarly accountable for their time, provided they got the job done. Gautney points to a ski trip taken by Fuson and Becker during work hours for which they were not counseled or terminated. AmeriGas asserts, however, that the ski trip was authorized by Jones and, therefore, Gautney, who took an unauthorized day off, was not similarly situated to Fuson and Becker. Despite AmeriGas' contention that it is undisputed that Fuson and Becker obtained prior authorization for their ski trip, it is apparent, as shown below, that a genuine issue of material fact exists as to whether Fuson and Becker had prior authorization.

Gautney has stated under oath that she told both Jones and Katz about the ski trip. According to Gautney, Jones told her it was the first he had heard of the trip. Jones has testified, however, that he gave prior authorization for the trip. Katz testified that he first learned of the trip from a human resources person on the day Gautney was terminated. Gautney has testified, however, that she specifically mentioned the trip a month prior to her termination. A further inconsistency is apparent when Jones' testimony is examined against Katz's testimony. Katz testified that Fuson and Becker skied on the weekend "on their own time" and on a workday—which he promptly investigated

and determined was an authorized two to three hour break from work. Jones, however, testified that he authorized the skiing excursion knowing that the two had worked through the weekend. In any case, the evidence concerning whether the ski trip was authorized is in dispute and, therefore, so is the question of whether AmeriGas treated similarly situated male employees differently than it treated Gautney.[4] Thus, Gautney had established a prima facie case of discrimination. *Harper v. Casey*, 1998 WL 614768, at *6 (E.D.Pa. Sept.14, 1998) (summary judgment denied where factual issues existed over whether defendant treated only women in a condescending way or whether he treated men of the office in the same manner, and whether he reprimanded the women and men differently for the same conduct).

■ AmeriGas further argues that even if Gautney can make out a prima facie case, she cannot show that its legitimate business reason for her termination, taking an unauthorized day off of work and lying about it, is pretextual. Once a plaintiff has established a prima facie case of disparate treatment, the burden of production shifts to the defendant to show a legitimate, nondiscriminatory reason for the adverse consequence to the employee. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). Once a defendant has established a legitimate business reason, the plaintiff must show that the proffered reason is a pretext for discrimination. To survive a motion for summary judgment, a plaintiff need not come forward with additional evidence of discrimination beyond the prima facie case, but she must produce evidence, direct of circumstantial, such a that a jury can reasonably infer from the inconsistencies, weaknesses, or implausibilities in the employer's reasons that they are not worthy of belief, or that a discriminatory reason was more likely than not a motivating or determinative cause in the decision. *Id.* at 764–65. A plaintiff does not have to show that discrimination was the sole reason. *Id.* at 764. Nor does the plaintiff have to prove at the summary judgment stage that

4. AmeriGas argues that Gautney cannot establish that it treated similarly situated male employees differently because it fired two male employees under similar circumstances. The first was Mark Zamora, an MDM who was fired for diverting a hotel credit owned by AmeriGas for his own personal use, in effect stealing a significant amount of money. The second is Castor, who was allowed to resign in lieu of termination shortly after Gautney was terminated. Castor was purportedly fired after taking a vacation day he did not have and his failure to reimburse AmeriGas for personal phone calls he charged to a company credit card some seven months prior to his termination.

Gautney argues that these are not proper comparators and that for disparate treatment purposes supporting an inference of discrimination the Court should focus on the treatment of Fuson and Becker. I agree. Zamora was fired for conduct which was much more egregious than taking an unauthorized day off of work. Furthermore, Gautney is not arguing that AmeriGas treated her differently than men who stole from the company but rather that AmeriGas treated her differently with respect to her taking time off.

In this respect Castor is a better comparator than Zamora. However, Castor, a systems analyst who does not travel much as part of his job, is not similarly situated to Gautney, a MDM who travels at least 60–70% of the time. Moreover, even if the Court were to consider a comparison to Castor proper, it does not resolve the questions surrounding the treatment of Gautney vis a vis Fuson and Becker, all of whom were MDMs.

In addition, using Castor as a comparator is problematic for AmeriGas because there is evidence from which a reasonable jury could find that Castor was treated more favorably than Gautney. For instance, Castor was allowed to resign in lieu of termination for conduct similar to conduct for which Gautney terminated: a significant difference in treatment for similar conduct. In addition, there is an inference of disparate treatment with respect to an incident prior to Castor's termination when Castor was merely charged a vacation day for taking an unauthorized day off. (Castor Dep. at 55). Indeed, at the time Katz confronted Castor, he told Castor that he would have to think about how to handle the situation, unsure whether he would make Castor take a day without pay or take a vacation day. (*Id.*). Termination was not apparently a consideration.

the employer's purported reason for its actions was false. *Nowosad v. Villanova Univ.*, 1999 WL 322486, at * 5 (E.D.Pa. May 19, 1999). The plaintiff need only introduce evidence sufficient to raise a doubt as to whether it was the true reason for the action. *Id.* The Court of Appeals for the Third Circuit has indicated that such a showing can be accomplished by demonstrating that "the employer treated other, similarly situated persons not of [her] protected class more favorably...." *Fuentes*, 32 F.3d at 765.

I conclude that Gautney has produced sufficient evidence to raise a genuine issue of fact which precludes the entry of summary judgment. *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir.1996) (en banc) (plaintiff may survive a motion for summary judgment if she "produced sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action."). Although Gautney does not present any direct evidence of discrimination and her circumstantial evidence is less than overwhelming, when the facts are viewed in the light most favorable to Gautney and all reasonable inferences are drawn in her favor, it is clear that summary judgment is inappropriate. Specifically, there is a factual dispute over whether Katz and Jones allowed male MDMs to take time off as they needed provided they "got the job done," while Gautney, who was getting the job done, was not given the same flexibility. Similarly, there is a factual dispute concerning Katz's investigation of the attendance of other male employees once it was brought to his attention as compared to his investigation of Gautney. *See Delli Santi v. CNA Ins. Co.*, 88 F.3d 192, 200–02 (3d Cir.1996) (although terminating plaintiff for falsifying expense reports was legitimate nondiscriminatory reason for termination, evidence that plaintiff was singled out and other employees, who had submitted the same or similar expense reports, were not similarly investigated, disciplined or terminated was suffi-

cient to support inference that defendant's proffered reason was pretextual). Accordingly, summary judgment on Gautney's disparate treatment claim will be denied.

### B. *Sexual Harassment/Hostile Work Environment*

Five elements must be proven to support a hostile work environment claim under Title VII:(1) the employee suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). My analysis will focus on the second and third elements only.

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment does not violate Title VII. *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The totality of the circumstances must be considered, including the frequency of the discriminatory conduct, its severity, whether its physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance. *Id.*

With respect to the regular and pervasive requirement of the second element, the evidence presented involves the following: (1) after a business meeting in April 1997, co-workers visited a strip club and excluded Gautney (Complaint at ¶ 16; Gautney Dep. at 85–87); (2) after a business meeting in New Orleans in September 1997, Gautney and the other MDMs went to a strip club (Gautney Dep. at 88–90); (3) during the same trip to New Orleans, Fuson lowered his pants and showed a group of people a tattoo on his pelvic bone (without exposing his genitalia) (Gautney Dep. at 50); (4) Jones told Gautney that men did not like aggressive wom-

en, that she was only using ⅛ of her assets and that she should dress in a skirt and heels (Gautney Dep. at 42–43); (5) Fuson discussed how "best to use women to increase sales" (Gautney Dep. at 47); (6) Castor discussed the size of his sex organs and his escapades with other women (Gautney Dep. at 54); (7) Castor showed Gautney a story that he had written which included sexually explicit content (Gautney Dep. at 52).

While the comments and conduct of her co-workers may be unprofessional, offensive, and callow, they, in isolation or collectively, do not rise to the level of unlawfulness within the purview of Title VII. Unlike other cases involving hostile work environments, there is no evidence here that Gautney was subjected to extensive inquiries into her sex life or that comments were made about her physical sexual anatomy or that sexual material was displayed in the work place. Nor is there any evidence that Gautney was subjected to unwanted touching, that she ever felt physically threatened or humiliated or that any offensive conduct interfered with her work performance. *See Andrews,* 895 F.2d at 1486 (evidence to be considered in determining whether work environment was hostile includes name calling, displaying pornography, displaying sexual objects on desk, disappearance of plaintiffs' work product, anonymous phone calls and destruction of other property); *Bishop v. Nat'l R.R. Passenger Corp.,* 66 F.Supp.2d 650, 663 (E.D.Pa.1999) (no hostile environment where plaintiff was not subjected to unwanted sexual advances, improper touching, insults, unreasonable criticism, the appearance of sexual imagery or pornography, obscene language or gestures or any significant intrusions of a sexually hostile nature); *LaRose v. Philadelphia Newspapers, Inc.,* 21 F.Supp.2d 492 (E.D.Pa.1998) (allegation that supervisor raised hand at plaintiff insufficient to establish hostile work environment); *McGraw v. Wyeth–Ayerst Labs., Inc.,* 1997 WL 799437 (E.D.Pa. Dec.30, 1997) (allegation that supervisor repeatedly asked plaintiff out on dates and kissed her against her will insufficient to establish hostile work environment); *Cooper–Nicholas v. City of Chester,* 1997 WL 799443 (E.D.Pa. Dec.30, 1997) (allegation that supervisor made numerous disparaging and vulgar remarks insufficient to establish hostile work environment). Gautney also has not produced evidence that she was subjected to regular or persistent harassment. As most, the evidence shows that Gautney was subjected to isolated offensive utterances. In sum, her allegations simply do not amount to severe and pervasive harassment.

■ Moreover, there is no evidence that the conduct Gautney now characterizes as "harassment" detrimentally affected her. For instance, she admits that she understood Castor's "propositions" to be made in jest. Furthermore, after reading his X-rated story, Gautney told Castor she thought it was well written and that he obviously had an understanding of a woman's body. There is no evidence that she was coerced, pressured or otherwise forced to go to the strip club. On the contrary, her participation was consensual. Gautney also made jokes of a sexual nature and participated in conversations about sex. Consequently, Gautney cannot establish that she subjectively perceived her working environment to be hostile or abusive. *Pittman v. Continental Airlines, Inc.,* 35 F.Supp.2d 434, 442 (E.D.Pa.1999) (plaintiff who "engaged freely" about sex could not establish that she subjectively perceived environment as hostile).

I conclude that a factfinder could not reasonably characterize the incidents complained of as severe, pervasive, or regular. In addition, Gautney has not met the subjective standard of proving that she was detrimentally affected by the alleged comments. There is no evidence that Gauntney was upset by the incidents at the time of any occurrence or during her employment period or that her work performance was affected in any way.

Because Gautney has failed to present a triable question of fact on two essential elements of her prima facie case for hostile work environment, summary judgment is appropriate. Accordingly, I will grant summary judgment in favor of defendants and against Gautney on the Title VII claim to the extent that she asserts a sexual harassment hostile work environment claim.

## C. *Retaliation*

Title VII also makes it unlawful for an employer to discriminate against an employee "because [the employee] has opposed any practice made an unlawful practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of discriminatory retaliation, a plaintiff must demonstrate that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Nelson v. Upsala College,* 51 F.3d 383, 386 (3d Cir.1995). Once the prima facie case has been established, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employment action in question. *Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 501 (3d Cir.), *cert. denied,* 502 U.S. 940, 112 S.Ct. 376, 116 L.Ed.2d 327 (1991). After this, the plaintiff must then demonstrate that the employer's explanation is pretextual. *See Waddell v. Small Tube Prods., Inc.,* 799 F.2d 69, 73 (3d Cir.1986).

█ The Court of Appeals for the Third Circuit does not require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of protected conduct. *See Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 702 (3d Cir.1995) (citing *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990) (allowing informal protests of discriminatory practices such as complaints to management and expressing support of co-workers who have filed formal charges)). On the other hand, merely complaining generally about unfair treatment does not constitute a protected activity. *Id.; Armfield v. Jacobson,* 1998 WL 427560, at *8 (E.D.N.Y. Jan.21, 1998) (neither letter complaining of "conduct unbecoming of an officer" nor grievance alleging "harassment and abuse" attributed conduct to racial discrimination); *Sosky v. Int'l Mill Serv., Inc.,* 1996 WL 32139, *10 (E.D.Pa. Jan.25, 1996) (general complaint of unfair treatment to Human Resources Department without mentioning that age was a factor not protected activity), *aff'd,* 103 F.3d 114 (3d Cir.1996).

In *Barber,* the plaintiff, a chief clerk for a transportation company, applied for another position in the company. When that position was awarded to another candidate, he wrote a letter to the human resources department complaining that a less qualified candidate was selected. Although it was clear from the letter that the plaintiff thought he had been treated unfairly, the letter did not allege that age was the reason for the unfair treatment. In affirming the district court's granting of summary judgment, the Court of Appeals reasoned that "[a] general complaint of unfair treatment does not translate into a charge of illegal age discrimination." *Barber,* 68 F.3d at 702.

Similarly, in *Sosky,* the district court held that complaining about unfair treatment does not translate into a charge of discrimination merely because the complaint is forwarded to the person allegedly engaging in the discriminatory conduct. 1996 WL 32139, at *10. In *Sosky,* the plaintiff alleged that his supervisor made a number of agist comments which corresponded with a growing dissatisfaction with his work. The plaintiff spoke with members of the human resources department, complaining that he was being treated unfairly. He did not, however, suggest that this treatment was the result of age

discrimination. The human resource people in turn communicated to his supervisor that he had complained and his supervisor criticized him for taking their alleged problems to the human relations department. *Id.* at *2. The court, relying on *Barber,* held that merely complaining about unfair treatment is not protected by either the ADEA or the PHRA and that the plaintiff's retaliation claim must fail because he did not engage in a protected activity.

■ Here, Gautney argues that she notified Human Resources personnel at a luncheon that she was being discriminated against and thereafter she was subjected to retaliatory conduct which culminated in her termination. Gautney also argues that she complained to Jones "about her work environment" and the way Katz treated her. (Gautney Aff at ¶ 8). Finally, she argues that she complained to Katz about being treated differently. Specifically, she asked Katz why he always assumed the worst about her and that the way she asked the question should have alerted Katz to the fact that she thought it was a gender issue. (*Id.* at ¶ 9).

At best, the evidence here is that Gautney complained in general terms that she thought she was being treated differently. None of the evidence, however, supports an inference that her supervisors knew she was complaining of gender or sex discrimination or that her vague complaints could reasonably lead to retaliatory animus. A mere reference to being treated differently or unfairly followed by the denial of any differential treatment is insufficient to establish that she engaged in a protected activity. In addition, what Gautney thinks Katz should have inferred from the intonation with which she asked a question as part of a longer conversation is insufficient to carry her burden on summary judgment to point to some evidence that she engaged in a protected activity.

Furthermore, it is undisputed that Gautney did not notify anyone at AmeriGas of the incidents she now claims constituted a hostile work environment or sexual harassment: Gautney did not tell anyone in Human Resources that Castor gave her an offensive story or engaged in offensive conversations; she did not report any inappropriate statements made by any other AmeriGas employee; and, she did not tell anyone at AmeriGas that she was offended by anything that happened in New Orleans or that she was excluded from a visit to a strip club in Baltimore. In sum, Gautney has failed to establish that she complained of unlawful discrimination. Accordingly, summary judgment will be granted on Gautney's claim of retaliatory discharge.

### D. State Law Claims

■ AmeriGas also moves for summary judgment on Gautney's breach of contract claim and Pennsylvania Wage Payment and Collection Law claims. The basis for Gautney's claims is the assertion that she was entitled to a bonus under the "Management Incentive Plan."

■ The WPCL does not create a statutory right to compensation. *Hartman v. Baker,* —— A.2d ——, 2000 WL 527891, at *4 (Pa.Super. May 3, 2000). Rather, it provides a statutory remedy when the employer breaches a contractual right to earned wages. *Oberneder v. Link Computer,* 548 Pa. 201, 696 A.2d 148, 150 (1997). Whether specific wages are due is determined ·by the terms of the contract. *Doe v. Kohn Nast & Graf, P.C.,* 862 F.Supp. 1310, 1325 (E.D.Pa.1994). Bonuses owed under an employment contract are "wages" within the meaning of the Act. 43 P.S. § 260.2a (wages include "any other amount to be paid pursuant to an agreement to the employe"); *Hartman,* 2000 WL 527891, at *5, —— A.2d —— (equity interest was payment pursuant to binding agreement, was offered to plaintiff as an employee and not for reason entirely unrelated to their employment); *Bowers v. NETI Technologies, Inc.,* 690 F.Supp. 349, 353 (E.D.Pa.1988).

AmeriGas does not argue that Gautney has not earned a bonus or does not have a contractual right to a bonus. *See Herbst v. Gen. Accident Ins. Co.,* 1999 WL 820194, at *8 (E.D.Pa. Sept.30, 1999) (plaintiff did not show that he had a contractual right to a bonus under "incentive program" or that plaintiff had earned the bonus prior to discharge); *Redick v. Kraft, Inc.,* 745 F.Supp. 296, 303 (E.D.Pa.1990) ("right to a wage or bonus must have vested under the terms of employment"). Instead, it argues that under the terms of the incentive plan, her discharge for misconduct relating to the performance of her job made her ineligible for a bonus. Thus, AmeriGas argues that it did not breach the terms of the agreement.

In opposition to the motion for summary judgment, Gautney has presented evidence sufficient to create a genuine issue of material fact as to whether the reason for her discharge was pretextual. Because there is a factual dispute regarding the reason for her discharge, summary judgment is inappropriate on her breach of contract claim and her WPCL claim.

## IV. CONCLUSION

Based upon the foregoing, the motion will be denied in part and granted in part. An appropriate Order will follow.

### ORDER

AND NOW, on this 28th day of July, 2000, upon consideration of the motion of the AmeriGas Propane, Inc. for summary judgment (Document No. 11), and response of Jill M. Gautney thereto, as well as the pleadings, depositions, affidavits, and admissions on file, and for the reasons set forth in the foregoing memorandum, it is hereby **ORDERED** that the motion of the defendant is **GRANTED IN PART AND DENIED IN PART,** and accordingly:

1. **SUMMARY JUDGMENT** is **ENTERED** in favor of the defendant on **Counts I and II** to the extent that they claim sexual harassment/hostile work environment in violation of Title VII and the PHRA.

2. **SUMMARY JUDGMENT** is **DENIED** on **Counts I and II** to the extent they claim disparate treatment on account of gender in violation of Title VII and the PHRA.

3. **SUMMARY JUDGMENT** is **ENTERED** in favor of the defendant on **Counts III and IV.**

4. **SUMMARY JUDGMENT** is **DENIED** on **Counts V and VI.**

**IT IS FURTHER ORDERED** that the parties shall submit a joint, written report to the Court no later than **August 21, 2000,** as to the status of settlement. If the parties need the assistance of the Court in facilitating settlement negotiations, the report should so indicate. Otherwise, the parties should be prepared to have the case listed for trial.