Laura ZELINSKI Plaintiff

v.

PENNSYLVANIA STATE POLICE, Commonwealth of Pennsylvania, Lou Altieri, Richard Weinstock

No. 3:CV–01–1979.

United States District Court, M.D. Pennsylvania.

Sept. 10, 2003.

Spero T. Lappas, Serratelli, Schiffman, Brown & Calhoon, P.C., Harrisburg, PA, for Plaintiff.

Sarah C. Yerger, Office of Attorney General, Harrisburg, PA, Alexia Kita Blake, Hourigan, Kluger & Quinn, PC, Scranton, PA, James P. Golden, Jane B. LaPorte, Hamburg & Golden, P.C., Thom-

as Moshang, III, Philadelphia, PA, Kimberly D. Borland, Borland & Borland, Wilkes–Barre, PA, for Defendants.

### *MEMORANDUM*

VANASKIE, Chief Judge.

Plaintiff Laura Zelinski commenced this action on October 15, 2001, asserting claims under 42 U.S.C. §§ 1983, 1985, 1988, and 2000e, the First and Fourteenth Amendments to the United States Constitution, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. Ann. § 955. (Complaint, Dkt. Entry 1, ¶ 9.) Zelinski was employed as a Trooper by Defendants, the Commonwealth of Pennsylvania and the Pennsylvania State Police ("PSP"). She claims that the individual Defendants, Corporal Louis Altieri and Trooper Richard Weinstock, exposed her to a sexually hostile work environment and then caused her to receive an adverse position transfer in retaliation for her complaining of inappropriate conduct. The Complaint contains 11 counts, the first four of which are against the PSP for, respectively, "sexual harassment/discrimination under federal law," "sexual harassment/discrimination under state law," "unlawful retaliation under federal law," and "unlawful retaliation under state law." Counts 5 through 8 assert the same claims against the Commonwealth of Pennsylvania. Count 9 claims that defendant Altieri violated Zelinski's civil rights, and Count 10 asserts that Weinstock violated her civil rights. Count 11 claims that the defendants engaged in a conspiracy to violate Zelinski's civil rights.[1]

Currently pending before the Court are Weinstock's motion to dismiss, (Dkt. Entry 9); Weinstock's motion for summary judgment, (Dkt. Entry 36); Altieri's, PSP's, and the Commonwealth of Pennsylvania's (collectively, the "Commonwealth Defendants") motion for summary judgment, (Dkt. Entry 40); and the Commonwealth Defendants' motion to strike portions of Zelinski's brief in opposition and answer to the Commonwealth Defendants' statement of material facts because they are purportedly based upon incompetent evidence. (Dkt. Entry 57.)

The motion to dismiss will be denied because the complaint satisfies the liberal pleading requirements of Fed.R.Civ.P. 8 and sufficiently alleges Weinstock's role as a supervisor and superior officer to Zelinski, as well as severe and pervasive sexual harassment. Weinstock's motion for summary judgment, however, will be granted. He is not subject to liability under 42 U.S.C. § 2000e because there is no individual liability under Title VII of the Civil Rights Act of 1964. Although the face of the complaint satisfies Rule 8, it is clear after discovery that Weinstock, as Zelinski's co-worker, did not act under color of law during the incidents of sexual harassment—a necessary element of the § 1983 claim alleged in Count 10. Summary judgment is also appropriate on Count II because Zelinski has failed to produce evidence that supports her allegation of a conspiracy to deny her federal civil rights under 42 U.S.C. § 1985.

The Commonwealth Defendants' motion to strike will be denied, but their motion for summary judgment will be granted. First, it is clear that the Eleventh Amendment bars Zelinski's PHRA, § 1983 and § 1985 claims against the Commonwealth and the PSP. Second, Altieri cannot bear any liability under Title VII. Third, Zelinski has not presented evidence sufficient to

---

1. The complaint does not identify the substantive statutory provisions on which the claims rest. Presumably, Zelinski relies upon 42 U.S.C. §§ 1983, 1988 and 2000e for her claims asserted in Counts 1, 3, 5, 7, 9 and 10; the PHRA for claims presented in Counts 2, 4, 6 and 8; and 42 U.S.C. § 1985 for the conspiracy claim presented in Count 11.

show a hostile work environment. Fourth, Zelinski has not proffered evidence sufficient to show that she engaged in protected activity prior to her transfer and has not presented any evidence that her transfer was causally related to a conversation concerning Weinstock's inappropriate conduct that she had with defendant Altieri ten months before her transfer. Finally, the conspiracy claim also cannot survive summary judgment because Zelinski has not presented evidence showing an agreement among the defendants to deprive Zelinski of her civil rights.

## I. *BACKGROUND*

Laura Zelinksi began employment with the PSP in April 1996 as a Trooper. (Commw. Def. Stat. of Material Facts, Dkt. Entry 42, ¶ 2; Ex. A, Dkt. Entry 43, Zelinski Dep. at 7–8.) [2] Effective May 1, 1999, she was detached to the Bureau of Drug Law Enforcement ("BDLE"), Troop P–Tactical Narcotic Team ("TNT"). (Commw. Def. Stat. of Material Facts, Dkt. Entry 42, ¶ 5.) The TNT unit specialized in undercover drug investigations and consisted of Troopers Zelinski, Sean Murray, Daniel Wigley, Richard Weinstock, and Corporal Louis Altieri, the unit supervisor. (*Id.,* ¶¶ 3–4.)

Upon her detachment to the TNT unit, Zelinski underwent a training period during which she was coached by officers of another Troop. (*Id.,* ¶ 5.) As part of her training, Zelinski attended a week long wiretap training class in Hershey, Pennsylvania from June 22, 1999, through June 26, 1999. (Ex. A, Dkt. Entry 43, Zelinski Dep. at 35–37.) Weinstock also attended this training. Zelinski and Weinstock were staying at the same hotel. On the second or third day of the class Zelinski accepted an offer from Weinstock to drive her to class. (*Id.* at 35–36.) Zelinski testified that on the way back to the hotel after the class the following transpired:

> [Weinstock] began the conversation with saying that he was attracted to me since he met me at April's class, which was the basic drug investigators course. And he started to use the analogy that, do you see those shoes that you are wearing? And I didn't know exactly where he was going with that. And I said what do you mean? He said—this is as we're driving toward the hotel. He said, you wouldn't wear the same pair of shoes every day would you? And I said, Rich I just met your wife. We haven't even started working together yet. And he put his hand on my knee at the time,

2. Under Local Rule 56.1, a party moving for summary judgment must file a "separate, short and concise statement of material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." A party opposing a summary judgment motion must respond to the numbered paragraphs in the moving party's statement of material facts. Both the movant's and the opponent's statements of material facts must contain references to the record to support their respective assertions. "All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." In this case, both the Com-

monwealth Defendants and Weinstock have complied with Local Rule 56.1 by submitting a separate statement of material facts. (Dkt. Entries 37 & 42.) Zelinski has filed responses to these statements. (Dkt. Entries 53 & 55.) The Local Rule 56.1 statements will be cited where Zelinski has admitted the movant's assertion. For matters that are not admitted in the Local Rule 56.1 statements, the appropriate part of the record that supports a factual assertion will be cited.

Weinstock's Statement of Material Facts is limited to his lack of a supervisory role vis a vis Zelinski. Therefore, most citations of factual material will be to the Commonwealth Defendants' Local Rule 56.1 Statement.

and I brushed it off. I said, you shouldn't be talking to me like that. As we were driving, I said, we work together. He said, but wouldn't it be neat? I said, no. I said, I don't feel that way. I said, I don't think that's appropriate. And he continued to say that he wanted to come back to my room to give me a full body massage.

We were supposed to meet Trooper Dan Wigley and Sergeant Robbie Castner that night for dinner. They were there for other training. And I guess we were supposed to meet them at 6.

As soon as we pulled into the hotel, I felt very uncomfortable. I said, I'm going to go shopping. I'll see you later. And I left. I went to the outlets in Hershey and I came back late—it had to be 6:30 or 7:00 that night—and went to my room. I didn't have any other contact with him that night.

*(Id.* at 36–37.)

Zelinski states that she told another trooper attending the class, Trooper Jamie Clark, and her two coaches, Troopers Gina Tasselmeyer and William Schutter, about the incident. (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 18; Ex. A, Dkt. Entry 43, Zelinski Dep. at 38–39.) Zelinski did not inform anyone else of the incident at that time.

Zelinski did not have any other contact with Weinstock until August of 1999. (Ex. A, Dkt. Entry 43, Zelinski Dep., at 41.) On August 4, 1999, Zelinski and Weinstock were assigned to ride a van together on a surveillance operation. (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 20.) Zelinski testified that at the beginning of this operation, Weinstock said he wanted to have sex with her and had been thinking about it since June. (Ex. A., Dkt. Entry 43, Zelinski Dep., at 42.) He then proceeded to describe in graphic terms what he wanted to do to her. (*Id.* at 42–43.) Zelinski responded by telling Wein-

stock that he made her feel uncomfortable. (*Id.* at 46.) They then proceeded to a mini-mart to obtain a beverage, met another trooper, and completed the surveillance assignment. (*Id.* at 43–44.)

It is undisputed that Weinstock did not make any other sexual advances towards Zelinski after the August 4, 1999 incident. It is further undisputed that Zelinski had no contact with Weinstock for the next several months as he was assigned to an investigation in Lancaster. (*Id.* at 73–74.)

On August 25, 1999, Zelinski acknowledged receipt of the PSP Sexual Harassment Policy. (Ex. J., Dkt. Entry 43.) The policy proscribed any sexual harassment, which it defined as "unwelcome verbal or physical conduct of a sexual nature, sexual advances, or requests for sexual favors." (Ex. H, Dkt. Entry 43, at 2.) The policy further provided that "[a]ny person who believes they have been sexually harassed, *and wants to report the incident to the Department,* shall contact their immediate supervisor, the EEO Liaison, or the EEO officer." (*Id.* at 6; emphasis added.)

Zelinski's immediate supervisor was Corporal Altieri. It is clear that she did not go to Altieri to report Weinstock's sexual advances. She testified, however, that she made Corporal Altieri aware of the offensive conduct in a conversation that occurred at the end of an undercover surveillance operation on October 14, 1999. Zelinski testified that, at the end of their shift on the night of October 14, 1999, the following transpired:

[W]e were en route back to the barracks, I believe. Corporal Altieri asked me, how are you getting along with other members of the unit? I said, well, we haven't really worked together too much

. . . .

I told him if I had to sit and do surveillance with Trooper Weinstock . . . that I would feel uncomfortable . . . and then I

told him what had taken place at the wire tap class, that he was making advances towards me.

At that time I had just met his wife. And then the next day he is saying these things to me. I don't believe I got into detail about especially the second incident. I didn't tell him how he graphically told me how he wanted to have sex with me. I didn't tell Corporal Altieri that.

I told him that he wanted to have sex with me. I told him I felt uncomfortable. I said, if I had to do surveillance by myself with him just like I did in August in that capacity with just one-on-one, I would feel uncomfortable.

And I was upset telling him it. I said, I just started in the unit. I don't want any problems. I want to do my best and do this work.

\* \* \* \* \* \*

And after I finished telling him he said, I can't believe that. I don't believe you.

\* \* \* \* \* \*

I said, that's what he said. It's true. And he said, he seems like a really nice guy, or something to that effect, what he thought of Weinstock.

Corporal Altieri then said, well, how are you going to work with him? I said, I want to try. I said, I just started in the unit. I want to do this type of work.

\* \* \* \* \* \*

I said, I'm just telling you in case we're in this capacity, Weinstock and I. I'm going to feel uncomfortable about it. He said he wouldn't say anything to him about it. And that's how we left the

conversation. And that was once we returned to Troop P, Wyoming. And then we just left the barracks that night.

Ex. A, Dkt. Entry 43, Zelinski Dep. at 74–76. Zelinski was then asked whether she requested that Corporal Altieri take any action on the matter. She replied as follows:

I said, I want to try. I just started the position. And I said that again to him. *I said, no, I don't want anything done about it.*

*Id.* at 76; emphasis added.[3]

Although acknowledging that Weinstock did not make sexual advances towards her after August 4, 1999, Zelinski claims that he made comments on two other occasions that constituted sexual harassment. First, on December 30, 1999, while conducting a surveillance at a bar, Weinstock allegedly told Zelinski, "If I can see down your sweater, everyone else can." (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 34–35; Ex. A, Dkt. Entry 43, Zelinski Dep. at 189–91.) Zelinski testified that she reacted to this statement by shaking her head and walking away and avoiding Weinstock the remainder of the night. (*Id.* at 48–49.) Second, on June 28, 2000, Zelinski alleges that Weinstock made repeated comments in front of other police officers that he could see Zelinski's underwear. (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 37–38.) Again, she handled the incident by shaking her head and walking away. (Ex. A, Dkt. Entry 43, Zelinski Dep. at 51.) Furthermore, Zelinski did not inform Corporal Altieri about these comments. (*Id.*, ¶¶ 36, 39.)

**3.** In her response to the Commonwealth's defendants' statement of material facts, Zelinski admitted that "[a]fter telling Altieri about Weinstock's comment, [she] told Altieri that she did not want anything done about it". (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 23.) She also related that her remark to Altieri that she did not want anything done about the matter "did not relieve Altieri of his affirmative duty to take action." (Answer to Comw. Def. Stat. of Material Facts, Dkt. Entry 53, ¶ 23.) It should be noted, however, that Altieri denies that Zelinski ever told him about Weinstock's alleged sexual advances. (Ex. B., Dkt. Entry 43, Altieri Dep. at 19–30, 41.)

There were also two comments by Altieri and Weinstock that were reported second-hand to Zelinski by Trooper Murray, another member of the TNT unit. In November 1999, Trooper Murray told Zelinski that Altieri had told him and Weinstock in June of 1999 that Zelinski was a sexual harassment case waiting to happen. (*Id.*, ¶ 41–42; Ex. A, Dkt. Entry 43, Zelinski Dep. at 30–31.) Zelinski did not confront either Altieri or Weinstock about this comment. (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 43.) She did, however, believe that Altieri told Weinstock of her report of offensive conduct. (Ex. A, Dkt. Entry 43, Zelinski Dept. at 77.)[4]

In February of 2000, Weinstock stated to Trooper Murray that Zelinski had tried to "hurt him with Altieri," and Weinstock was now going to hurt Zelinski. (Complaint, ¶ 19(g).)[5] Murray related this to Zelinski after Weinstock had failed to monitor a "panic pager" while Zelinski was conducting an undercover drug purchase. Zelinski contends that Weinstock's failure to monitor the pager placed her in physical danger. (Ex. A, Dkt. Entry 43, Zelinski Dep. at 52, 191–92.)

Although Zelinski did not confront either Altieri or Weinstock about the "harassment suit waiting to happen" remark, she did have a discussion with Weinstock in Altieri's presence about having been called an "asshole" by Weinstock. (Ex. A., Dkt. Entry 43, Zelinski Dep. at 59.) This discussion occurred in January of 2000. According to Zelinski, Altieri arranged the meeting because of problems within the entire unit, and Altieri believed that Zelinski and Weinstock "had the smallest problem in the unit as a whole." *Id.* at 60. During the January, 2000 meeting, Zelinski complained that Weinstock had refused to provide her with assistance on investigations. She also referenced the fact that Weinstock had called her an "asshole." According to Zelinski, Weinstock did not respond at all. (*Id.* at 66.) After Weinstock left the meeting, Zelinski reiterated that she was going to continue to do her job and would try to include Weinstock in investigations. (*Id.* at 68.)

Zelinski believed that Altieri favored Weinstock, and that she was subject to unfair criticism. For example, she contends that after execution of a search warrant in January, 2000, Altieri told her in front of others that he did not think the execution of the warrant was well planned. (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 47.) Although she contends that she was singled out and that male officers were not usually critiqued after searches, Zelinski acknowledges that Weinstock was also criticized after the search for being too aggressive in detaining suspects. (*Id.*, ¶ 48.)

Zelinski also contends that she was unfairly treated by Altieri with respect to the execution of a warrant during which she discharged her weapon. Zelinski had fired at a lunging dog, but missed, and the dog was killed by another officer. Some members of the execution team believed that

---

4. Zelinski also testified that another trooper had told her in November of 1999 that Weinstock had said that she was a sexual harassment suit waiting to happen. (Ex. A, Dkt. Entry 43, Zelinski Dep. at 52–53.)

5. Weinstock admits making this comment, but denies that he had any knowledge of Zelinski's allegations of sexual harassment. (Ex. B, Dkt. Entry 54, Weinstock Dep. at 70–71.) Rather, he claims that the comment was made after Zelinski reported to Altieri that he had lied on his time sheets. (*Id.*) Furthermore, Weinstock points out that Murray did not interpret the remark as threatening physical harm to Zelinski. (Ex. F, Dkt. Entry 43, Murray Dep. at 44–46.) Zelinski did not confront either Altieri or Weinstock about the alleged comments.

Zelinski had misfired her weapon. (*Id.*, ¶ 50.) During a debriefing after the search, Zelinski stated that more TNT members should have been present because they have better training in the execution of search warrants than patrol members. (*Id.*, ¶ 51.) Shortly thereafter, a rumor circulated that some members of patrol were upset by Zelinski's comment and warned that they would not serve search warrants with TNT. (*Id.*, ¶ 52.) Zelinski disputes that any patrol officers took offense, but admits that the rumor circulated within the unit. (Ex. A, Dkt. Entry 43, Zelinski Dep. at 121–24.) On or about April 14, 2000, Altieri met with Zelinski and criticized her for misfiring her weapon during the execution. He also informed Zelinski that he had placed a disciplinary note in her file six weeks earlier.[6] (*Id.* at 127–28.)

On July 7, 2000, Altieri had a meeting with Zelinski in which he criticized her for not having charges prepared and told her that he was denying overtime that she had submitted because he had not approved it in advance.[7] (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 26.) Zelinski claims that this discipline was pretextual and retaliatory. (Pl. Response, Dkt. Entry 53, ¶ 26.) She alleges that Altieri told her at this meeting that everyone in the chain of command was "on board" with him and that she should not buck the chain of command. (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 27.) This chain of command included, in order of seniority, Altieri, Sergeant Michael Ruda, Lieutenant Mark Lomax, Captain John Duignan, and Major Tyree Blocker. (*Id.*, ¶ 28.)

Following this meeting, Zelinski went to the FOP lodge president, Trooper Joe Plant, and told him that there were threats and intimidation in the TNT.[8] Plant attempted to set up a meeting with Sergeant Ruda, but Ruda refused because he was meeting with the TNT about other issues. (*Id.*, ¶ 29.) On July 18, Ruda met with Zelinski and Altieri. (*Id.*, ¶ 30.) During this meeting, Ruda informed Zelinski that he was denying her overtime request for the reasons stated by Altieri. He also instructed Zelinski to attend a search warrant execution training session because of the incident in which Zelinski had shot at a dog. (*Id.*, ¶ 31.) After asking Altieri to leave, however, Ruda told Zelinski that she was doing a good job. (*Id.*, ¶ 32.) Zelinski did not tell Ruda about any of Weinstock's comments, or any other act of sexual harassment, at this meeting. (*Id.*)

It is clear that the TNT team began to have problems almost from its formation. (Ex. A., Dkt. Entry 43, Zelinski Dep. at 27.) Altieri attempted to resolve the tension through various meetings. In January 2000, Altieri and Zelinski discussed problems with the team and Zelinski told Altieri that there was tension between Weinstock and the rest of the team. (Commw. Def. Stat. Of Material Facts, Dkt. Entry 43, ¶ 57.) As noted above, Altieri met with Weinstock and Zelinski in an attempt to work out the problems between them. At this meeting, Zelinski stated that "I don't know if I feel comfortable not having Sean Murray or Dan Wigley not present here while we're having this conversation because it's a unit problem. We all each have our individual

---

6. The alleged disciplinary note was not produced during discovery.

7. Altieri also denied Wigley's overtime submission. (*See* Ex. G, Dkt. Entry 43, Wigley Dep. at 64–69.)

8. She did not complain to Plant that there was a sexually hostile work environment.

problems with Rich Weinstock." (*Id.*, ¶ 58.)

Altieri conducted another meeting in June 2000 with all the unit members during which he asked who was unhappy. Wigley, Murray, and Zelinski stated that they had safety concerns regarding the unit's Drug Abuse Response Team (DART) program,[9] and believed that Altieri was pushing them to arrest too many targets at the expense of their safety. (*Id.*, ¶ 25.) Subsequently, Altieri informed his immediate supervisor, Sergeant Ruda, that there were problems in the unit. Specifically, he informed Ruda that all members of the unit, with the exception of Weinstock, were insubordinate and were not returning pages.

On August 10, 2000, Sergeant Ruda conducted a meeting with his immediate supervisor, Lieutenant Lomax, and Altieri. The purpose of the meeting was to discuss supervisory problems within the TNT unit. During the course of this meeting, Sergeant Ruda recommended that Trooper Wigley be terminated from the TNT unit, but that Zelinski be retained. (Ex. E, Dkt. Entry 43, Ruda Dep. at 18–19.)

Lieutenant Lomax passed the information up the chain of command to Captain Duignan. (Ex. D, Dkt. Entry 43, Duignan Dep. at 20–21.) Lomax recommended that Trooper Wigley be removed from the TNT unit, but that Zelinski be retained. (*Id.* at 21.) Captain Duignan then called Corporal Altieri. Based upon information provided by Altieri, Duignan concluded that Wigley and Zelinski were similarly situated. Altieri did not take any position with respect to a change in status for either Wigley or Zelinski. (*Id.* at 32.) He did state, however, that he would rather be shorthanded and seek help from a patrol unit then continue to work with those posing supervisory problems. (*Id.* at 34–35.) Following his conversation with Altieri, Captain Duignan recommended to Major Blocker that both Zelinski and Wigley be removed from the TNT unit. (*Id.* at 36.)

On August 21, 2000, Zelinski and Wigley were told to report to Major Blocker's office in Harrisburg, where they were both informed that they were being transferred back to patrol. (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 59.) Zelinski did not lose rank or pay when she was transferred out of BDLE. (*Id.*, ¶ 61.) After two months working in a patrol unit, Zelinski began working in the vice narcotics unit with Troop P, Wyoming. (*Id.*, ¶ 60.)

Approximately a week after her transfer, on August 29, 2000, Zelinski made a written sexual harassment complaint to the PSP Equal Employment Opportunity Officer. (Ex. A, Dkt. Entry 43, Zelinski Dep. at 179–80; Ex. K, Dkt. Entry 43.)[10] On November 15, 2000, she filed a complaint with the Pennsylvania Human Rela-

---

9. The goal of the DART program was to saturate particular areas of drug activity with law enforcement officials in order to curb activity in the area and increase the number of arrests. (*See* Ex. D, Dkt. Entry 43, Duignan Dep. at 28.)

10. This complaint prompted an internal investigation that culminated in a finding that Weinstock had harassed Zelinski because of her gender and in retaliation for reporting sexual harassment. (Exhibit 25 to the Deposition of Corporal John Duby, submitted as part of Exhibit "A" to plaintiff's brief in opposition to the summary judgment motions, Dkt. Entry 54.) A finding was also made that Corporal Alteri had "allowed a hostile work environment to perpetuate within the [TNT] Unit for an extended period of time." (Ex. 26 to the Duby Dep.) It was determined, however, that Zelinski had not complained to Altieri of sexual harassment on October 14, 1999, and that Altieri had not retaliated against her. (*Id.*) In this regard, it should noted that Altieri testified that he did not receive any disciplinary action as a result of Zelinski's complaint. (Ex. B, Dkt. Entry 43, Alteri Dep. at 66.)

tions Commission. (Commw. Def. Stat. of Material Facts, Dkt. Entry 18, ¶ 69.) After receiving a right to sue letter, Zelinski brought this action.

## II. *THE MOTION TO STRIKE*

Before turning to the dispositive motions, it is necessary to consider what evidence is properly before the court. The Commonwealth Defendants have filed a motion to strike portions of Zelinski's brief in opposition and her answer to the Commonwealth defendants' statement of material facts. Specifically, the Commonwealth Defendants object to Zelinski's citation to several exhibits to Corporal John Duby's deposition. The contested documents are part of the PSP internal investigation of Zelinski's claims conducted by Duby. These exhibits include an unsworn statement by Lieutenant Paul Mendofik, an unsigned and unsworn transcript of the taped interview of Corporal Nicholas Gushka, and several internal PSP documents attached to Duby's deposition. (Def. Mot. to Strike, Dkt. Entry 57, ¶¶ 3–9.) These documents include a summary report by Lt. Colonel Thomas K. Coury sustaining Zelinski's claims against Weinstock (Ex. 25), a similar report concluding that Altieri had allowed a hostile work environment to exist within the TNT unit but did not retaliate against Zelinski for filing a complaint, (Ex. 26), and two corresponding Disciplinary Action Reports. (Exs.27–28.)

When a summary judgment movant files a motion to strike under Rule 56(e), the movant has the burden to show that the documents in question are not admissible. *See* 10B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2738 (3d ed.1998).

The papers of the party opposing summary judgment have been treated by courts with "some indulgence." *Cont'l Aircraft Sales v. McDermott Bros. Co.,* 316 F.Supp. 232, 236 (M.D.Pa.1970). *Accord Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir.1987)(stating that "the papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party");

In moving to strike these deposition exhibits, the Commonwealth Defendants argue that the exhibits do not comply with Fed.R.Civ.P. 56(e) because 1) the exhibits are hearsay statements, 2) were not based on Duby's personal knowledge, and 3) were not properly identified or authenticated.[11] (*See* Def. Brief in Support of Mot. to Strike, Dkt. Entry 59, at 3.) In support, the Commonwealth Defendants cite *Berwick Grain Co. v. Illinois Department of Agriculture,* 116 F.3d 231, 234 (7th Cir. 1997). *Berwick,* however, involved a transcript of a witness interview that was not submitted to the court either in the form of an affidavit or a deposition. Thus, the court properly concluded that the evidence was not admissible. Zelinski has not merely submitted Duby's report, but has submitted the report as an exhibit to Duby's deposition. *Berwick,* therefore, is inapposite.

More applicable in this context is *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1542 (3d Cir.1990), cited by Zelinski for the proposition that a nonmoving party need not produce evidence in a form admissible at trial in order to avoid summary judgment. Rather, "hearsay evidence produced in an affidavit opposing summary judgment may be considered if

**11.** These exhibits, which were part of a PSP Bureau of Professional Responsibility report, were produced by the *defendants* during discovery. (Ex. B, Pl. Brief in Opp. to Mot. to Strike, Dkt. Entry 60.) Given their origin, it does not appear that the defendants can credibly attack the authenticity of the exhibits at this stage of the litigation.

the out-of-court declarant could later present the evidence through direct testimony. . . ." *Id.* (citing *Williams v. Borough of W. Chester,* 891 F.2d 458 (3d Cir.1989)). *Accord Brown v. Muhlenberg Township,* 269 F.3d 205, 212 n. 5 (3d Cir.2001). The witnesses who were interviewed by Duby—Mendofik and Gushka—can be called at trial.[12] While Zelinski has not cited any authority holding that the results of the investigation would be admissible, they have been considered in addressing the dispositive motions and it would be a hollow act to order them stricken. The results of the internal investigation are not dispositive of the questions presented here and do not defeat summary judgment. Accordingly, the motion to strike will be denied.

## III. THE SUMMARY JUDGMENT MOTIONS

### A. Standard of Review

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194, 197 (3d Cir.), *cert. denied,* 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988); *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation,* 912 F.2d 654, 657 (3d Cir.1990). Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### B. Eleventh Amendment

 Eleventh Amendment sovereign immunity stands for two propositions: "first, that each State is a sovereign entity in our federal system; and second, that it is inherent in the nature of sovereignty not

---

**12.** Additionally, Zelinski argues that the witnesses were under legal and administrative obligations to speak truthfully to Duby at the time the statements were made. (Pl. Brief in Opp. to Mot. to Strike, Dkt. Entry 60, at 3, citing Ex. A, Dkt. Entry 54, Duby Dep. at 9–10.)

to be amenable to the suit of an individual without its consent." *Seminole Tribe v. Florida*, 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)(internal quotations omitted).[13] Thus, by virtue of the Eleventh Amendment, the Commonwealth of Pennsylvania cannot be sued in federal court under state law. *See* 1 Pa. Cons. Stat. Ann. § 2310. Moreover, "[t]he Eleventh Amendment's bar extends to suits against departments or agencies of the state having no existence apart from the state." *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir.1981)(citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). The PSP, therefore, is also protected from suit by the Eleventh Amendment. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

 Sovereign immunity may be waived by a state's consent, but the waiver must be "unequivocally expressed." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Commonwealth of Pennsylvania has not consented to suit in this matter, nor has the PSP. *See* 42 Pa. Cons.Stat. Ann. § 8521(b)(withholding consent to suit in federal court); *Moore v. Pa.*

*Dep't of Military & Veterans Affairs*, 216 F.Supp.2d 446, 454 (E.D.Pa.2002)(holding that Pennsylvania state agencies are immune from suit under the PHRA in federal court); *see also Jones v. S.E. Pa. Transp. Auth.*, 565 Pa. 211, 772 A.2d 435, 438–39 (2001). Zelinski, recognizing the strength of the sovereign immunity argument, "does not contest the defendants' challenges to the PHRA claims ... or the 1983 claims against the Commonwealth." (Pl. Brief in Opp., Dkt. Entry 51, at 16 n. 18.) Accordingly, summary judgment for the Commonwealth and the PSP will be granted on counts II, IV, VI, and VIII (the PHRA claims), and on counts I, III, V and VII on the § 1983 claims.[14] *See Quern v. Jordan*, 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)(holding that 42 U.S.C. § 1983 does not override States' Eleventh Amendment immunity). Similarly, the § 1985 conspiracy claim asserted against the Commonwealth and PSP in Count XI is barred. *See Breslin v. Brainard*, No. 01–CA–7269, 2002 WL 31520480, at *3 (E.D.Pa. Oct.30, 2002)(citing *Seeney v. Kavitski*, 866 F.Supp. 206, 209 (E.D.Pa.1994), and *Quern*, 440 U.S. at 339–46, 99 S.Ct. 1139).[15]

 Sovereign immunity, however, is not applicable if Congress validly abro-

---

**13.** The Eleventh Amendment provides:

> The Judicial Power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Eleventh Amendment prohibits suits against a state by its own citizens or citizens of another state. *See Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

**14.** Regardless of the Eleventh Amendment immunity, the § 1983 claims against the PSP must be dismissed because only persons can be sued in a § 1983 suit. *Mich. Dep't of State Police*, 491 U.S. at 64, 109 S.Ct. 2304. The PSP does not constitute a "person" for pur-

poses of a § 1983 claim. *Id.* at 71, 109 S.Ct. 2304 (Michigan Department of State Police was not a "person" for purposes of § 1983).

**15.** The Eleventh Amendment does not deprive this Court of jurisdiction to enter an award of damages against the individual defendants in their individual capacities. *See Helfrich v. Pennsylvania Dep't of Military Affairs*, 660 F.2d 88, 90 (3d Cir.1981). Although Zelinski does not specify in what capacity Altieri and Weinstock are being sued, it is clear from the complaint that she intended to sue them in their individual capacities. *See Gregory v. Chehi*, 843 F.2d 111, 119–20 (3d Cir.1988)(determining that the defendants were sued in their individual capacities where complaint named the state entity as defendant and sought punitive damages).

gates it through its enforcement powers under the Fourteenth Amendment. *Seminole Tribe*, 517 U.S. at 57–73, 116 S.Ct. 1114. It has been held that Congress abrogated the States' sovereign immunity under section five of the Fourteenth Amendment when it enacted Title VII. *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Accordingly, the substantive merits of the Title VII claims will be addressed. Before doing so, however, the viability of the claims asserted against the individual defendants will be assessed.

### C. The Claims Asserted Against Individual Defendants

Altieri is the sole defendant on Count 9 of the complaint; Weinstock is the sole defendant on Count 10 of the complaint; and both Altieri and Weinstock are named as defendants in Count 11 of the complaint, charging conspiracy. The complaint in this case, however, does not specify the substantive law on which the claims for relief are based. Three separate statutory provisions appear to form the premise for Zelinski's claims against the individual defendants: Title VII, § 1983 and § 1985.[16]

### 1. The Title VII Claims

There is no individual liability under Title VII. *See Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 183–84 (3d Cir.1997); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1077 (3d Cir.1996). Therefore, Zelinski cannot maintain a Title VII cause of action against Altieri and Zelinski.

### 2. The Section 1983 Claims

In addition to Title VII, Zelinski claims that both Altieri and Weinstock have violated 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege a violation of rights secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under the color of state law. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.1995); *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir.1993).

Weinstock challenges Zelinski's § 1983 claims in both his motion to dismiss and his motion for summary judgment. In the motion to dismiss, Weinstock argues that he could not have been acting under color of state law because both Weinstock and Zelinski were PSP troopers engaged in undercover work, and Weinstock did not act as Zelinski's supervisor at any of the times during which the alleged offensive conduct occurred. (Def. Brief in Support, Dkt. Entry 13, at 4.) "A finding of liability under 42 U.S.C. § 1983 requires that the defendant ... have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 23 (3d Cir.1997) (citations omitted). If Weinstock did not enjoy a supervisory position over Zelinski, he could not exercise state authority over her—*i.e.*, he could not be a state actor. *See id.* at 23–24 (distinguishing the facts before the court from those in *Rouse v. City of Milwaukee*, 921 F.Supp. 583 (E.D.Wis.1996), where the plaintiff failed to show that a police officer, who held the same rank as the plaintiffs

16. Zelinski has cited 42 U.S.C. § 1988 as one of the statutory bases for her claims. Section 1988, however, does not provide an independent cause of action. Rather, it provides that "[i]n any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 ... the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988; *see Moor v. County of Alameda*, 411 U.S. 693, 702, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973).

and did not have authority to give them orders, had acted under color of state law).

The motion to dismiss must fail on this ground because the Complaint, on its face, alleges that Weinstock was, at certain times, Zelinski's co-worker, but that at other times he was her supervisor and superior officer. (Complaint, ¶ 4.) The Court may not consider evidence extrinsic to the pleadings on a motion to dismiss.[17] *See Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994)(stating that a court may look only to facts alleged in the complaint and its attachments); *Unger v. Nat'l Residents Matching Program,* 928 F.2d 1392, 1400 (3d Cir.1991)(court must draw all reasonable inferences from the facts pled in the complaint and construe them in the light most favorable to the claimant). Therefore, the motion to dismiss will be denied.

■ Zelinski's claim against Weinstock, however, does not withstand summary judgment analysis. No evidence has been presented to suggest that Weinstock was Zelinski's superior at any time that he engaged in the alleged acts of sexual harassment. Zelinski points out that Weinstock was on Commonwealth duty at the times of his acts of harassment. She argues that "[i]f Plaintiff was a non-commonwealth employee, visiting a state police facility on other business (to report a crime, for example) and was sexually harassed by a state trooper, no one would

have the slightest problem recognizing this as a Fourth and Fourteenth Amendment action cognizable under section 1983." (Pl. Brief in Opp., Dkt. Entry 52, at 3.) Zelinski's argument is meritless. The Third Circuit has made clear that "the essence of section 1983's color of law requirement is that the alleged offender, in committing the act complained of, *abused a power or position granted by the state."* *Bonenberger,* 132 F.3d at 24 (emphasis added). A state trooper harassing a civilian acts from a position of authority granted by the state. Not so co-workers within a state police unit. None of the factors found relevant by the Third Circuit in *Bonenberger* are present here. Weinstock could not alter Zelinski's workload nor would Zelinski face charges of insubordination if she failed to follow Weinstock's orders. *Id.* at 24–25.[18]

"[A]n otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state." *Mark,* 51 F.3d at 1150. Weinstock did not enjoy a position of authority over Zelinski deriving from his status as a state trooper. Therefore, Zelinski cannot satisfy the state action requirement of § 1983 as to Weinstock. Accordingly, because Weinstock also cannot be held liable under Title VII, he is entitled to judgment in his favor on Count 10 of the Complaint.

Altieri was Zelinski's supervisor at all relevant times. Therefore, he is a proper defendant to the § 1983 claim.[19] Zelinski

---

**17.** In deciding a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a claim where "the plaintiff can prove no set of facts in support of the claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A Rule 12(b)(6) motion will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Pa. House, Inc. v. Barrett,* 760 F.Supp. 439, 449–50 (M.D.Pa.1991).

**18.** Zelinski states in her brief that an equal protection/sexual harassment case may be brought against a fellow police officer in a § 1983 case, and cites *Andrews* in support. Zelinski overlooks the fact, however, that the plaintiffs in *Andrews* sued only their supervisors as individual defendants. *See Andrews,* 895 F.2d at 1476.

**19.** Of course, he is not a proper defendant to the Title VII claim.

asserts that Altieri engineered her transfer out of the TNT unit in retaliation for her complaints of sexual harassment. The substance of this claim will be addressed under the discussion concerning Zelinski's Title VII claims.

### 3. *The Section 1985 Claim*

Count 11 alleges that the defendants conspired to violate Zelinski's civil rights. Although the complaint does not specify under what statute this count is brought, a claim for conspiracy to violate federal civil rights falls squarely under 42 U.S.C. § 1985, the only statute referenced in the complaint that deals with conspiracy. Section 1985(3) prohibits conspiracies based on racial or other class based discriminatory animus. Our Court of Appeals summarized the requirements necessary to state a claim under § 1985(3) in *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997):

> [A] plaintiff must allege (1) a conspiracy; (2) motivated by racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.

Section 1985(3) protects against conspiracies motivated by discriminatory animus against women. *See Novotny v. Great Am. Fed. Sav. & Loan,* 584 F.2d 1235, 1262 (3d Cir.1978), *rev'd on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Zelinski, however, has failed to satisfy the first requirement of *Lake*—she has not shown the existence of a conspiracy. In her briefs in opposition, Zelinski points to the following facts as sufficient evidence of conspiracy: (1) Weinstock and Altieri were unusually close; (2) Zelinski complained to Altieri about Weinstock in October 1999 and Altieri, knowing that he had a duty to report this harassment notwithstanding Zelinski's stated desire to let the matter drop, took no action on the complaint; (3) Altieri had a history of overlooking and ignoring Weinstock's unlawful behavior; (4) Altieri disclosed the complaint to Weinstock who was thereby motivated to "get" Zelinski; and (5) Weinstock and Altieri spoke of Zelinski in the same words—as a sexual harassment case waiting to happen. (*See* Pl. Brief in Opp. to Weinstock's S.J. Mot., Dkt. Entry 52, at 7.)

"[I]t is not enough to use the term 'conspiracy' without setting forth sufficient facts that tend to show an unlawful agreement." *Gordon v. Lowell,* 95 F.Supp.2d 264, 270 (E.D.Pa.2000). The evidence set forth by Zelinski simply does not show an agreement between the defendants to discriminate against Zelinski. Zelinski has alleged that Altieri ignored her complaint and that he told Weinstock of the complaint. All this shows is independent action by Altieri. The fact that either Weinstock or Altieri told the other that Zelinski was a "sexual harassment case waiting to happen" and the other repeated the phrase, does not show that they had agreed to discriminate against Zelinski. Because there is no evidence of agreement to discriminate, summary judgment will be granted in favor of the individual defendants on Count 11 of the complaint.

### D. *Title VII*

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, proscribes employment discrimination on account of race, color, religion, sex and national origin. As made clear by the brief in opposition to the Commonwealth Defendants' summary judgment motion, Zelinski asserts the following theories of liability under Title VII:(1) hostile work

environment sexual harassment, and (2) retaliation.[20]

### 1. *Hostile Work Environment*

In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Court recognized that sexual harassment in employment may be actionable under Title VII "if the sexual harassment at issue was either a *quid pro quo* scenario, or if the harassment was so pervasive that it had the effect of creating a hostile work environment and altering the conditions of employment." *Suders v. Easton*, 325 F.3d 432, 441 (3d Cir.2003). The Court emphasized that "not all work place conduct that may be described as 'harassment' affects a 'term, condition or privilege' of employment within the meaning of Title VII." *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399. Instead, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (Internal quote omitted).

▬▬▬ In *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990), our Court of Appeals held that a plaintiff bringing a sexually hostile work environment claim must establish the following:

(1) the employee suffered intentional discrimination because of his or her gender; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. Intentional discrimination—the first factor—"is implicit in cases involving 'sexual propositions, innuendo, pornographic materials, or sexual derogatory language.'" *Suders*, 325 F.3d at 441 (quoting *Andrews*, 895 F.2d at 1482 n. 3). "The second factor requires that the 'incidents of harassment occur either in concert or with regularity.'" *Id.* The third factor involves "a subjective inquiry of whether the particular plaintiff was demonstrably injured." *Id.* The fourth factor "insures that employers are held liable only when the work environment is hostile from the standpoint of a reasonable person." *Id.* at 442. In determining whether a plaintiff has proffered sufficient evidence to warrant a trial on a charge of hostile work environment, the court is to consider "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or a mere offensive utterance, and whether it unreasonably interferes with an employee's work per-

---

**20.** Zelinski's brief in opposition to the motion to dismiss contained two numbered headings—one pertaining to a hostile work environment and the other concerning alleged retaliation. In her Complaint, however, Zelinski also claimed a "persistent pattern of *quid pro quo* sexual harassment." (Complaint, ¶ 15.) To establish *quid pro quo* harassment, a plaintiff must show that she suffered a tangible employment action that resulted from her acceptance or rejection of a supervisor's alleged sexual harassment. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296 (3d Cir.1997). The Commonwealth Defendants argued in support of their summary judgment motion that discovery had failed to disclose evidence sufficient to support a claim

of *quid pro quo* harassment. Zelinski's failure to respond to this argument is tantamount to a concession that there is insufficient evidence to substantiate such a claim. There is no evidence that any supervisor of Zelinski made any sexual advances, requests for sexual favors, or otherwise engaged in verbal or physical conduct of a sexual nature. Weinstock's alleged conduct does not fall within the framework of a *quid pro quo* harassment claim because he was not her supervisor at the time of the alleged sexual advances. The harasser must have the authority to carry out a *quid pro quo* offer or threat. *See Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 80 (3d Cir. 1983). Thus, there is no basis for a *quid pro quo* harassment claim here.

formance." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The conduct "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). These standards for judging hostility are sufficiently demanding to insure that Title VII does not become a " 'general civility code.' " *Id.* at 788, 118 S.Ct. 2275. As explained by Judge Joyner:

> It follows that the purview of Title VII does not extend to all work place difficulties, even where the conduct at issue may be crass and unwarranted. Likewise, allegations of isolated or single incidents of harassment do not constitute a cognizable hostile work environment claim.

*Saidu–Kamara v. Parkway Corp.,* 155 F.Supp.2d 436, 439 (E.D.Pa.2001).

 In this case, Zelinski has established only that Weinstock engaged in conduct properly classified as intentional discrimination based upon gender by making sexual advances towards her on two occasions. While Weinstock's alleged conduct was outrageous, it ended in early August of 1999, more than one year before her transfer from the TNT unit. A rational jury could not conclude that the conduct was pervasive or regular. The other incidents—stating that he was able to see down her sweater (in December of 1999) and could see her underwear (in June of 2000)—were not only isolated in time, but also mere offensive utterances. While crude and inappropriate, the remarks cannot be said to be part of a pervasive or regular pattern of a sexually intimidating work atmosphere.

 Nor has Zelinski proffered any evidence to show a demonstrable impact on her ability to work as a result of Weinstock's conduct. Zelinski does not contend that she missed work because of Weinstock's advances and inappropriate remarks. She does not contend that her performance was somehow impaired by emotional distress suffered as a result of Weinstock's conduct. She did not seek psychiatric counseling until more than one year after she was removed from the TNT unit, and saw a psychiatrist then on only two occasions. (Ex. A, Dkt. Entry 43, Zelinski Dep. at 155–56.) Although she had expressed some concern about working with Weinstock, she also actively sought to involve him in her investigative work and complained when she did not receive adequate support from him. Given this evidence, a rational jury could not find that Weinstock's conduct detrimentally affected Zelinski.

 Finally, the sporadic inappropriate conduct of Weinstock cannot be said to have created an atmosphere that a reasonable police officer in plaintiff's position would have found as objectively hostile. In this regard, Zelinski conceded that Altieri never made any inappropriate remarks to her or engaged in any conduct that could be characterized as sexually intimidating. (*Id.* at 139.) The evidence also indicates that Zelinski had a positive rapport with the other male members of the TNT unit. While Weinstock's conduct should be subject to appropriate discipline, it does not rise to the level that changed the terms or conditions of Zelinski's employment.

In similar circumstances, courts have directed judgment in favor of employers. For example, in *Saidu–Kamara,* 155 F.Supp.2d at 439–40, a co-worker had engaged in four separate actions described as "loathsome and inappropriate." First, the co-worker told the plaintiff that she looked "fresh," and asked her to join him later that evening. Several months later, he made suggestive comments regarding her eyes and offered her financial assistance if

she would go out with him. On a third occasion, he asked her to join him at a local hotel where they could have a "good time." And on the fourth occasion, he patted her buttocks and breast. Judge Joyner directed entry of judgment in favor of the employer, concluding that the four incidents, spread over 18 months, were neither sufficiently severe nor pervasive to support a hostile work environment claim.

Similarly, Weinstock's conduct was not sufficiently severe or pervasive to sustain a conclusion that Zelinski was exposed to a hostile work environment. The advances occurred early in her tenure with the TNT unit, and were not repeated. Zelinski was not physically threatened by Weinstock nor were propositions made in public. Although Weinstock's actions, as alleged by Zelinski, were decidedly inappropriate, they did not give rise to an objectively hostile work place. *See, e.g., Saxton v. Am. Tel. & Tel. Co.,* 10 F.3d 526 (7th Cir.1993)(finding no severe or pervasive conduct where supervisor made several advances towards plaintiff, repeatedly touched her legs on one occasion, and kissed her without permission); *Bacone v. Philadelphia Hous. Auth.,* No. Civ. A. 01–CV–419, 2003 WL 21223822 (E.D.Pa. May 7, 2003) (fellow police officer exposing her breasts to plaintiff in public, making physical contact with his person, and inviting him to go home with her did not amount to conduct altering the terms and conditions of employment so as to support a hostile work environment claim); *Gautney v. Amerigas Propane, Inc.,* 107 F.Supp.2d 634 (E.D.Pa.2000)(sexually explicit conversation by co-workers and comments that plaintiff was not using all her "assets" not severe or pervasive).

Similarly, Altieri's conduct does not rise to the level of "severe or pervasive," even when considered in the context of Weinstock's conduct. Zelinski has pointed only to evidence that Altieri criticized her at times. That fact does not suggest a sexually hostile work environment. *See Miller v. Aluminum Co. of Am.,* 679 F.Supp. 495, 502 (W.D.Pa.), *aff'd,* 856 F.2d 184 (3d Cir. 1988)("Snubs and unjust criticisms of one's work are not poisonous enough to create an actionable hostile work environment."). Nor could Altieri's conduct be objectively viewed as sexually hostile. Zelinski tries to tie Altieri to Weinstock through the comment about Zelinski being a sexual harassment suit waiting to happen—a comment that was never made to Zelinski herself—and through the fact that Altieri and Weinstock were closer than other members of the unit. This is insufficient.

Furthermore, the evidence does not show that Zelinski was detrimentally affected by Altieri's actions. As noted above, there is no record of an effect on Zelinski's work performance or personal life. This is not a case where the harassment became so severe or pervasive that the plaintiff was constructively discharged. *See, e.g., Suders, supra* (holding that constructive discharge resulting from harassment including name-calling, repeated sexual gesturing, obscene and offensive sexual conversations, and the posting of vulgar images constituted adverse employment action). Zelinski only mentioned Weinstock's behavior to a superior once, and on that occasion she requested that Altieri not pursue the matter. Revealingly, Zelinski reported this conduct two months after Weinstock's second and last advance. She never complained about the clothing comments, not even to Weinstock. When she did complain to superiors, her complaints were restricted to work-related issues such as overtime, Weinstock's general abrasiveness, and Altieri's criticism.

Zelinski has not satisfied the requirements for a sexual harassment claim based on a hostile work environment. She has not shown that she was subjected to

severe or pervasive harassment that adversely affected her or altered the conditions of employment. Therefore, defendants are entitled to judgment on this claim.

## 2. *Retaliation*

■ Zelinski also claims that Altieri retaliated against her for reporting Weinstock's improper conduct. To present a prima facie claim of retaliation, a plaintiff must show (i) she engaged in a protected employee activity; (ii) the employer took an adverse employment action against her; and (iii) there is a causal link between the protected activity and the adverse employment action. *Weston v. Pennsylvania*, 251 F.3d 420, 430 (3d Cir.2001). "If the plaintiff succeeds, the burden of production shifts to the defendant to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 n. 2 (3d Cir.1997)(quoting *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817).

Zelinski has alleged that she engaged in a protected activity by reporting Weinstock's conduct to her supervisor, Altieri. Thus, the retaliation claim primarily involves Altieri, not Weinstock. Specifically, Zelinski argues that Altieri instigated her transfer by making complaints about her which he reasonably believed would go up the chain of command and result in her transfer. According to Zelinski, Altieri began complaining about Zelinski's job performance to his direct supervisor, Sergeant Michael Ruda, on June 10, 2000, some 8 months after she mentioned Weinstock's offensive conduct. (Pl. Brief in Opp., Dkt. Entry 51, at 9.) Zelinski contends that Altieri knew that his negative reports would reach a decisionmaker with authority to discipline Zelinski. Ultimately, they reached Captain John Duignan on August 10, 2000. Duignan called Altieri, who gave "a blistering account of the plaintiff's alleged deficiencies." (*Id.*)

When Duignan suggested that transferring Zelinski would leave the TNT unit shorthanded, Altieri indicated that he would rather be understaffed than have the problems he had been confronting. Within days, Major Blocker effectuated the transfer. (*Id.*, at 9–10.)

Zelinski's attempt to formulate a prima facie case of retaliation fails at both the first and final steps. That is, there is insufficient evidence of any protected activity undertaken by Zelinski, and there is no evidence of any causal relationship between her mentioning Weinstock's advances to Altieri and her transfer.

As to the first element, a "protected activity" in the context of Title VII is demonstrated where an employee "has opposed any practice made an unlawful employment practice by [Title VII,]" or where the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." 42 U.S.C. § 2000e–3(a). In *Barber v. CSX Distribution Services*, 68 F.3d 694, 701–02 (3d Cir. 1995), the court ruled that in determining whether an employee has engaged in "protected activity," the message conveyed by the employee, "and not the medium of conveyance," is to be assessed. That is, a formal letter of complaint to the employer or to an employment discrimination agency is not "the only acceptable indicia of the requisite 'protected conduct'...." *Id.* at 702. Thus, the fact that Zelinski merely mentioned to Altieri Weinstock's inappropriate conduct is not dispositive.

■ Analysis of the message, however, compels rejection of her claim that she did engage in protected activity. While Zelinski made Altieri aware of Weinstock's inappropriate conduct, she also said that she did not want anything done about it. Moreover, the context of the communication militates against a finding of protected

activity. Zelinski did not go to Altieri to report on the matter. Instead, she brought up the subject during an informal conversation after Altieri had asked her how she was getting along. Furthermore, she did not report the details of the August 4, 1999 incident. Under these circumstances, Zelinski's mention of Weinstock's conduct, while asserting that she did not want anything done about it, is insufficient to satisfy the first prong of a retaliation claim.

 Even if the mere mention of the conduct is sufficient to constitute "protected activity," Zelinski cannot show a causal relationship between the alleged retaliatory act—her transfer from the TNT unit—and her alleged complaint.[21] Zelinski purportedly informed Altieri of Weinstock's allegedly sexually harassing comments in October of 1999. Her transfer from the TNT unit did not occur until August of 2000, more than ten months after she complained to Altieri. Moreover, Altieri did not begin complaining about Zelinski (and Wigley) up the chain of command until June 2000. Although the case law of this Circuit "is 'seemingly split' as to whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of a causal connection for the purposes of a prima facie case of retaliation," *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir.2000)(citing *Robinson*, 120 F.3d at 1302), the Third Circuit has made clear that "temporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not 'unusually suggestive.'" *Id.* at 280. A discharge two days after the filing of an EEOC claim has been held to be "unusually suggestive." *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989). A nineteen month span, however, was deemed too attenuated, by itself, to create an issue of material fact as to retaliation. *See Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir.1997). The ten month span in this case is not unusually suggestive. Thus, the delay from Zelinski's complaint to her transfer militates against a finding of causation. *See Bacone*, 2003 WL 21223822 at * 6 (sixteen month delay between complaint and alleged retaliatory transfer "too long to constitute evidence of causation....").

A plaintiff may "substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence that support the inference." *Farrell*, 206 F.3d at 280–81. Inconsistent

---

**21.** Adverse employment action does not include a supervisor's assessment of the plaintiff's performance. *See Primes v. Reno*, 190 F.3d 765, 767 (6th Cir.1999)("if every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure."); *Bragg v. Navistar Intl. Transp. Corp.*, 164 F.3d 373, 376–77 (7th Cir.1998). Thus, the meetings during which Altieri criticized Zelinski's job performance cannot be considered adverse employment actions animating a retaliation claim. The retaliation claim is necessarily limited to Zelinski's transfer back to patrol. The defendants argue that the transfer itself did not constitute an "adverse employment action" because she did not incur a loss of pay or rank. These facts alone, however, do not dictate a finding that Zelinski did not suffer an adverse employment action. *See Hampton v. Borough of Tinton Falls Police Dept.*, 98 F.3d 107, 115–16 (3d Cir.1996)(reversing summary judgment where plaintiff was transferred without loss of pay or rank and claimed that patrol assignment was less desirable than detective bureau); *Torre v. Casio, Inc.*, 42 F.3d 825, 831 n. 7 (3d Cir. 1994)("[A] transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action.") For purposes of the summary judgment motions, Zelinski's transfer back to patrol will be considered an "adverse employment action."

explanations for a plaintiff's termination or an intervening pattern of antagonism may prove a causal link. Any antagonism in this case, however, came from Weinstock, not Altieri. More importantly, Zelinski did not complain about any subsequent harassment (the underwear incidents) to Altieri. The record does show that tension within the TNT unit grew between October 1999 and June 2000, but this tension does not appear to have been related to the alleged harassment or the October 1999 conversation. Rather, the record shows that Murray and Wigley, as well as Zelinski, had work-related problems with Weinstock. (Commw. Def. Stat. of Material Facts, Dkt. Entry 42, ¶ 58; Ex. B, Dkt. Entry 43, Altieri Dep. at 26; Ex. F, Dkt. Entry 43, Murray Dep. at 78–80; Ex. B, Dkt. Entry 54, Weinstock Dep. at 35–37; Ex. G, Dkt. Entry 43, Wigley Dep. at 10, 13–16; Ex. A, Dkt. Entry 43, Zelinski Dep. 26–28.) This is insufficient to show a causal connection between Zelinski's transfer and the alleged harassment.

Also militating against a finding of any causal relationship is the fact that Altieri reported Trooper Wigley for insubordinate conduct, as well as Zelinski. Furthermore, there is no evidence that Altieri ever recommended that Zelinski be transferred. That Altieri had no control over the removal of troopers from his unit is demonstrated by the fact that only Wigley was recommended for transfer initially. Under these circumstances no rational jury could conclude that there is a causal relationship between Zelinski mentioning Weinstock's conduct to Altieri in October of 1999 and Major Blocker's decision to transfer her from Altieri's unit 10 months later. Therefore, summary judgment will be entered in the Commonwealth Defendants' favor on the retaliation claim.[22]

## IV. CONCLUSION

Weinstock's motion to dismiss will be denied, but his summary judgment motion on Count 10 will be granted because the evidence shows that he did not act under color of state law. Therefore, he cannot be liable under § 1983. Furthermore, there is no individual liability under Title VII. Summary judgment will be granted all the defendants on Count 11 because Zelinski has not proffered evidence that tends to show an agreement to deny her federal civil rights. The Commonwealth Defendants' motion to strike will be denied. The Commonwealth Defendants' motion for summary judgment, however, will be granted. The § 1983, § 1985 and PHRA claims against the Commonwealth and PSP are barred by the Eleventh Amendment, and Zelinski has not shown retaliation or a hostile work environment under Title VII.

Zelinski has presented evidence of highly inappropriate and unprofessional behavior on the part of Weinstock. (See Ex. A, Dkt. Entry 54, Duby Dep. Exs. 25–28.) She has also presented evidence of a failure by Altieri to properly supervise his

---

**22.** Zelinski also advanced a First Amendment retaliation claim. Several courts of appeals have held that retaliation for a harassment complaint does not necessarily involve a matter of public concern, because the complaint may simply raise a private matter that is unprotected by the First Amendment. See, e.g., Morgan v. Ford, 6 F.3d 750, 755 (11th Cir.1993); Hartman v. Bd. of Trustees, 4 F.3d 465, 471–72 (7th Cir.1993); Woodward v. City of Worland, 977 F.2d 1392 (10th Cir.1992), cert. denied, 509 U.S. 923, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993). Our Court of Appeals has also adopted this position. See Azzaro v. County of Allegheny, 110 F.3d 968, 979 (3d Cir.1997)("Under this view, if the employee's purpose was primarily to solve her own personal problem, the fact that her statement would be of value to the process of self-governance does not make the speech public concern speech.") As Zelinski has failed to show any retaliation, it is unnecessary to determine whether her complaint was protected speech.

unit. She has not, however, shown sexual harassment that is severe or pervasive such that her federal claims can survive summary judgment. Rather, she has shown that the TNT unit suffered from internal disputes and heightened tension. That situation is properly addressed within the PSP hierarchy, and is not properly the subject of federal court litigation. Therefore, summary judgment will be granted to the defendants and this matter shall be closed.

### ORDER

**NOW, THIS 10th DAY OF SEPTEMBER, 2003,** for the reasons set forth in the foregoing memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendant Richard Weinstock's Motion to Dismiss, (Dkt. Entry 9), is **DENIED**.

2. Defendant Weinstock's Motion for Summary Judgment, (Dkt. Entry 36), is **GRANTED**.

3. Defendants Pennsylvania State Police, Commonwealth of Pennsylvania, and Louis Altieri's Motion for Summary Judgment, (Dkt. Entry 40), is **GRANTED**.

4. The Motion to Strike portions of Plaintiff's brief in opposition and answer to defendant's statement of material facts, (Dkt. Entry 57), is **DENIED**.

5. The Clerk of Court is directed to enter judgment in favor of the defendants and to mark this matter **CLOSED**.